JANE B. STRANCH, Circuit Judge.
Approximately six weeks before Rogelio Mendoza-Garcia's final removal hearing, his attorney warned him that he needed to comply with the terms of their retainer agreement-that is, to pay the attorney. Mendoza-Garcia did not pay and, one week before the hearing, his attorney filed a *502 motion to withdraw. The immigration judge (IJ) granted the motion the day of the hearing. When Mendoza-Garcia requested a continuance to find a new attorney, the IJ denied the request, explaining that he would assist in developing the record. Mendoza-Garcia argues that the IJ violated his constitutional rights by denying the continuance and by failing to fully develop the record. The Board of Immigration Appeals disagreed and, for the reasons explained below, we DENY the petition for review.
I. BACKGROUND
Mendoza-Garcia came to the United States from Guatemala in 2004, when he was 16 years old. He was placed in removal proceedings approximately six years later, in March 2011. He appeared pro se at an initial scheduling hearing the next month and was granted a six-month continuance to find an attorney. With the help of retained counsel, he applied for asylum and withholding of removal within that six-month window. In the application, he stated that he was afraid to return to Guatemala because, years before, his hometown had been torn apart by violence after a mayoral election won through fraud.
The case then languished for reasons that are not clear from the record. More than six years later, in September 2017, Mendoza-Garcia attended another scheduling hearing, and his merits hearing was scheduled for November. On November 6, one week before that hearing took place, his attorney submitted a motion to withdraw. The attorney stated that he told Mendoza-Garcia on September 25, 2017-the day of the scheduling hearing-about an outstanding obligation related to their 2011 representation agreement. Mendoza-Garcia informed the attorney on November 3 that he was "unable to comply."
The motion had not been decided when Mendoza-Garcia and counsel attended the merits hearing in November. The IJ asked if Mendoza-Garcia objected to his attorney's withdrawal; he responded that he "did have some financial issues" and "request[ed] a little bit more of time." The IJ informed him that financial difficulty was not a "valid reason" to grant a continuance and asked again if Mendoza-Garcia objected. Mendoza-Garcia asked the IJ, "if he doesn't want to continue with my case, he's going to leave me by myself?" The IJ said yes, explaining, "you'll represent yourself, and I would ask you questions to help you develop your testimony regarding why you fear going back to your country." When asked a third time if he objected to his attorney's withdrawal, Mendoza-Garcia said no. The IJ granted the motion to withdraw, and the attorney left.
The hearing proceeded, working through two interpreters-one translating from English to Spanish, and the second from Spanish to Aguacateco, the indigenous language that Mendoza-Garcia speaks best. Mendoza-Garcia explained to the IJ that he was afraid to return to Guatemala because "when [he] was little, there was some serious issue or problem in [his] village and a problem that took place with the local mayor." When asked if anyone harmed him, he responded, "I do not want to lie but, no, no, and that's why I decided to come over here." He also denied that he had been threatened but asked "to be able to give a little bit of further explanation." The IJ responded that Mendoza-Garcia would be allowed to "say whatever [he] want[ed] to say," and asked if there was a "person or group" he feared would harm him. Mendoza-Garcia responded, "I don't fear any person in particular or a group, per se," but explained, "they made us to get involved with a group to protect the village," even giving him a gun.
*503 Later, the IJ asked if anyone would harm him if he returned to Guatemala. Mendoza-Garcia explained that, according to a new village law, anyone who did not collaborate with the new government at the time of the mayoral election had been "expelled from the village" and "wouldn't be allowed to live there anymore." His mother had confirmed to him that he had been expelled. The judge then asked if Mendoza-Garcia could live elsewhere in Guatemala. Mendoza-Garcia said he "just [didn't] want to go back to Guatemala," because he was "afraid something's going to happen to [him]," although he had "no idea what might happen."
After the IJ finished his questions, he summarized the voluntary departure process and asked if Mendoza-Garcia wished to apply. Before responding to the question, Mendoza-Garcia asked one more time if there was "a possibility for the Judge to give [him] more time to look for a lawyer." The IJ refused, and Mendoza-Garcia turned down voluntary departure. The Government attorney then cross-examined Mendoza-Garcia, questioning him about family members who still lived in his village and how long he had remained there after the contested election. When the cross-examination was complete, the IJ announced his decision that Mendoza-Garcia was not eligible for immigration relief.
Mendoza-Garcia appealed to the Board of Immigration Appeals (BIA or the Board), first pro se and then through pro bono counsel. As relevant here, he argued that (1) he had not been given a reasonable opportunity to obtain counsel and had not waived his right to counsel, and (2) the IJ failed to adequately develop the record. The BIA denied the appeal, reasoning that (1) the denial of a continuance was within the IJ's discretion because Mendoza-Garcia had six weeks' notice of counsel's intended withdrawal, and (2) in light of Mendoza-Garcia's admission that he was never harmed or threatened and his inability to identify specific harm he feared upon return, any error was not prejudicial. Mendoza-Garcia petitions for review.
II. ANALYSIS
A. Constitutional and Regulatory Background
Noncitizens in removal proceedings have long been protected by the Fifth Amendment's guarantee of due process of law. See Yamataya v. Fisher , 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903) (holding that a noncitizen may not "be taken into custody and deported without giving him all opportunity to be heard" because "[n]o such arbitrary power can exist where the principles involved in due process of law are recognized"). Removal "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom.... Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness." Bridges v. Wixon , 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). But we have also been clear for decades that the Sixth Amendment right to appointed counsel in criminal proceedings does not apply to civil removal proceedings. See Mustata v. U.S. Dep't of Justice , 179 F.3d 1017, 1022 n.6 (6th Cir. 1999) ; see also Denko v. INS , 351 F.3d 717, 723 (6th Cir. 2003). Procedural challenges to removal proceedings-including counsel-related challenges-are therefore evaluated under the due process "fundamental fairness" framework. See, e.g. , Denko , 351 F.3d at 723-24.
We have addressed the scope of the right to counsel under the Fifth Amendment in immigration proceedings many times. We stated decades ago that *504 "[w]here an unrepresented indigent alien would require counsel to present his position adequately to an immigration judge, he must be provided with a lawyer at the Government's expense. Otherwise, 'fundamental fairness' would be violated." Aguilera-Enriquez v. INS , 516 F.2d 565, 568 n.3 (6th Cir. 1975). More recently, on the basis that there is no "right to government-provided counsel in civil litigation," we stated that "[t]he Fifth Amendment simply does not guarantee the right to counsel or, it follows, the right to effective counsel in removal proceedings." Al-Saka v. Sessions , 904 F.3d 427, 434 (6th Cir. 2018). It is arguable that the statements from each case fall within the arena of dicta. See id. at 435 (White, J., concurring) (deeming the opinion's discussion of constitutional requirements "unnecessary"). Even so, this line of cases makes clear that we have consistently endorsed the Supreme Court's requirement that removal proceedings "meet the essential standards of fairness." Bridges , 326 U.S. at 154, 65 S.Ct. 1443. And we have defined those standards to include, at a minimum, the due process rights of a noncitizen "to make his case before the immigration authorities"-and, if he wishes, to "hire counsel" to do so. Al-Saka , 904 F.3d at 434. Thus, a noncitizen in removal proceedings has a due process right to be represented by retained counsel.
Due process requirements also adhere in cases involving pro se petitioners. As several other circuits have recognized,
it is the IJ's duty to fully develop the record. Because aliens appearing pro se often lack the legal knowledge to navigate their way successfully through the morass of immigration law, and because their failure to do so successfully might result in their expulsion from this country, it is critical that the IJ scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.
Al Khouri v. Ashcroft , 362 F.3d 461, 464-65 (8th Cir. 2004) (citations and internal quotation marks omitted) (quoting Agyeman v. INS , 296 F.3d 871, 877 (9th Cir. 2002) ); see also Delgado v. Mukasey , 508 F.3d 702, 706 (2d Cir. 2007) ("We also recognize that the IJ has an affirmative obligation to help establish and develop the record in the course of such proceedings, especially when, as here, an alien is unrepresented by counsel." (citations and internal quotation marks omitted)); Yang v. McElroy , 277 F.3d 158, 162 (2d Cir. 2002) ("[T]he IJ ..., unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record." (citing, among others, Richardson v. Perales , 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (finding that an administrative law judge "acts as an examiner charged with developing the facts"), and Charles H. Koch, Jr., Administrative Law and Practice § 5.25 (2d ed. 1997) (noting that "the presiding official is pivotal to the factfinding function of an evidentiary hearing and hence, unlike the trial judge, an administrative judge has a well established affirmative duty to develop the record"))).
We have fleshed out the duty to develop the record in the context of social security hearings. See Lashley v. Sec'y of Health & Human Servs. , 708 F.2d 1048, 1052 (6th Cir. 1983). Noting the danger to claimants lacking counsel and familiarity with hearing procedures, we explained: "To satisfy this special duty the administrative law judge must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." Id. (citations and internal quotation marks omitted). Pro *505 se noncitizens in removal proceedings likewise lack familiarity with or comprehension of the complex system of immigration laws. We agree with our sister circuits that to provide a fundamentally fair proceeding, immigration judges are bound by the recognized duty to help pro se parties develop the record.
Noncitizens also have "a statutory right to counsel." Ibarra-Reina v. Lynch , 651 F. App'x 427, 431 (6th Cir. 2016) (citing 8 U.S.C. § 1362 ). "Accordant with this statutory right, an alien must knowingly waive representation, and immigration judges must take pains to ensure that an alien's rights are protected when counsel wishes to withdraw." Id. (citing Ramirez v. INS , 550 F.2d 560, 565 (9th Cir. 1977), and Al Khouri , 362 F.3d at 464-65 ). Accompanying regulations provide that an IJ must, among other requirements, "[a]dvise the respondent of his or her right to representation, at no expense to the government, by counsel of his or her own choice" and "[a]dvise the respondent of the availability of pro bono legal services for the immigration court location at which the hearing will take place, and ascertain that the respondent has received a list of such pro bono legal service providers." 8 C.F.R. § 1240.10(a)(1), (2). Regulations also empower an IJ to "grant a motion for continuance for good cause shown." 8 C.F.R. § 1003.29.
B. Denial of a Continuance
Mendoza-Garcia first challenges the denial of a continuance. An IJ's decision to deny a continuance is reviewed for abuse of discretion. See Abu-Khaliel v. Gonzales , 436 F.3d 627, 634 (6th Cir. 2006). A denial amounts to an abuse of discretion if it "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination." Id. (quoting Balani v. INS , 669 F.2d 1157, 1161 (6th Cir. 1982) ).
As a formal matter, this claim could sound in due process or as a denial of a statutory right. There is no need to address any distinction between the two because, in this context, the statutory requirements satisfy any constitutional minimum. The relevant statutory requirements are laid out in Matter of C-B- , 25 I. & N. Dec. 888 (B.I.A. 2012), a BIA case cabining IJ discretion regarding continuances. According to the BIA, "to meaningfully effectuate the statutory and regulatory privilege of legal representation where it has not been expressly waived, the Immigration Judge must grant a reasonable and realistic period of time to provide a fair opportunity for a respondent to seek, speak with, and retain counsel." Id. at 889. In addition, "for a waiver to be valid, an Immigration Judge must generally (1) inquire specifically as to whether a respondent wishes to continue without a lawyer and (2) receive a knowing and voluntary affirmative response." Id. at 890 n.1. In that case, the noncitizen appeared unrepresented at an initial master calendar hearing and told the IJ "that he wanted to be removed that day." Id. at 889. But when the IJ questioned him later, he had changed his mind and wanted more time. Id. The Board explained that after this "change of heart," the IJ should have asked for clarification and ruled on the request for a continuance; she erred by instead proceeding directly to the merits. Id. at 890. If the IJ in this case "inexplicably departed from established policies" articulated in Matter of C-B- , that would qualify as an abuse of discretion. Abu-Khaliel , 436 F.3d at 634 (citation omitted).
We begin with the waiver analysis. Mendoza-Garcia told the IJ that he wanted "a little bit more" time to find a new attorney and expressed concern that *506 his attorney was "going to leave [him] by [him]self." After the IJ explained that he would ask "questions to help [Mendoza-Garcia] develop [his] testimony," he indicated that he had no objection to his counsel's withdrawal. Later, after the IJ finished questioning him, Mendoza-Garcia asked again, "Is there a possibility for the Judge to give me more time to look for a lawyer?" The IJ refused, and Mendoza-Garcia responded, "Then I just leave it in your hands whatever you want to do with me." This interaction does not amount to a "knowing and voluntary" waiver of rights. Matter of C-B- , 25 I. & N. Dec. at 890 n.1. Mendoza-Garcia repeatedly indicated that he did not want to proceed without counsel and only agreed that he had no objection the third time he was asked. Even if that eventual concession could amount to waiver, he later renewed his request for time to retain counsel. The Board made clear in Matter of C-B- that an IJ may not rely on a waiver that is later rescinded. Id. at 890. Because Mendoza-Garcia did not "expressly waive[ ]" his right to counsel, the IJ was required to "grant a reasonable and realistic period of time to provide a fair opportunity for [him] to seek, speak with, and retain counsel." Id. at 889.
Mendoza-Garcia was entitled to have that reasonable and realistic period after he knew that his retained counsel would no longer be representing him. For example, the Ninth Circuit has explained that the right to counsel was denied when an IJ "declin[ed] unreasonably to grant even a brief continuance so that [the noncitizen] could locate and appear with his attorney, whom the IJ had been told was in the building in another courtroom." Hernandez-Gil v. Gonzales , 476 F.3d 803, 808 (9th Cir. 2007). Regardless of the 16 months that had elapsed since the initial hearing, the IJ was still required to "take reasonable steps to ensure that the immigrant's statutory right to counsel is honored." Id . Here, too, the years that passed between the initial six-month continuance and the merits hearing are not relevant. The question is whether Mendoza-Garcia had a reasonable amount of time to find new counsel once he learned his attorney was withdrawing.
The relevant time period begins from one of four dates: (1) approximately six weeks before the hearing, on September 25, when-according to counsel's withdrawal motion-he "communicated the remaining obligation to [Mendoza-Garcia] and his family"; (2) ten days before the hearing, on November 3, when-again according to counsel's motion-Mendoza-Garcia "called Counsel ... claiming to be unable to comply"; (3) one week before the hearing, on November 6, when the motion to withdraw was filed; or (4) the day of the hearing, November 13, when the motion to withdraw was granted. We consider it highly unlikely that any of the three later dates-all amounting to less than two weeks' notice-would provide a reasonable and realistic period to find counsel.
The BIA, however, credited the earliest of these dates, citing the withdrawal motion and reasoning that Mendoza-Garcia "[did] not contest former counsel's assertion that he alerted the respondent of the need to comply with their 2011 representation agreement approximately 6 weeks before the respondent's final removal hearing." Mendoza-Garcia still does not contest that assertion. Instead, he argues that, although he was "aware of the breakdown in his attorney-client relationship, he remained represented until his counsel's last-minute motion to withdraw was granted-which happened to be the same day as his merits hearing." Though that may be so, he was on notice of the need to pay his attorney or find new representation, and other courts have deemed six weeks a *507 reasonable period to obtain counsel. See Delcimard v. Mukasey , 283 F. App'x 450, 452 (9th Cir. 2008) (mem.) (two continuances, totaling six weeks, to retain counsel); Alsamhouri v. Gonzales , 484 F.3d 117, 124 (1st Cir. 2007) (representation terminated six weeks before the hearing); Jean v. Gonzales , 435 F.3d 475, 483-84 (4th Cir. 2006) (motion to withdraw filed six weeks before hearing). Mendoza-Garcia has not identified any cases-and we are aware of none-finding that six weeks is not a reasonable period of time to obtain counsel.
We do not hereby endorse the practices employed by either the withdrawing attorney or the IJ. But abuse of discretion is a demanding standard, and Mendoza-Garcia has not argued that the BIA misunderstood the timeline or that his case presented unusual circumstances aside from his inability to pay counsel's fee. See, e.g. , Aguilera-Enriquez , 516 F.2d at 568 n.3. Denying the continuance cannot be said to be irrational, discriminatory, or a departure from established policies. See Abu-Khaliel , 436 F.3d at 634. We therefore conclude that the IJ did not abuse his discretion in denying Mendoza's request for a continuance.
C. Failure to Develop the Record
Mendoza-Garcia's briefing raises another potential due process violation: the IJ's failure to fully develop the record. The BIA concluded that any failure in questioning was immaterial "[i]n light of the respondent's unambiguous testimony that he was not harmed or threatened in the past, and did not fear specific harm upon return to Guatemala." We "review the Board's legal conclusions de novo but afford 'substantial deference' to its 'interpretation of the INA and accompanying regulations.' " Hernandez-Perez v. Whitaker , 911 F.3d 305, 312 (6th Cir. 2018) (quoting Shaya v. Holder , 586 F.3d 401, 405 (6th Cir. 2009) ).
In this case, the IJ posed open-ended questions that could elicit relevant responses. He asked about threats, harm, and fear, and he gave Mendoza-Garcia an opportunity at the end of the hearing to add whatever else he wished to say. As we explained in Lashley , however, it need not be the case that the judge "intended to produce an unfair result." 708 F.2d at 1052. In that case, the hearing "was fully transcribed in approximately 11 pages" and the applicant "possessed limited intelligence, was inarticulate, and appeared to be easily confused." Id. Thus, although the judge asked relevant questions, we held that "the superficial quality of the questioning deprived Lashley of a full and fair hearing." Id. at 1053.
Here, the IJ's questioning about Mendoza-Garcia's eligibility for relief takes up less than seven double-spaced transcript pages. Because the hearing proceeded through two layers of translation, eliciting those seven pages doubtless took a substantial amount of time-but responses elicited through this process were unusually prone to error and confusion. Despite that possibility, the IJ rarely asked for clarification and moved quickly from topic to topic. For example, when Mendoza-Garcia was first asked if he had ever been harmed in Guatemala, he responded, "I do not want to lie but, no, no, and that's why I decided to come over here." The interpreter repeated the translation, but the IJ did not pose the obvious follow-up question to that internally contradictory statement-did Mendoza-Garcia mean to say that he came to the United States because he had not been harmed, or because he had ? After the very next question, Mendoza-Garcia asked for an opportunity to give "further explanation" about his statement that he had not been threatened in Guatemala. The IJ said he would be permitted to "say *508 whatever [he] want[ed] to say"-but then never returned to the issue of threats. Instead, the IJ asked if there was "any person or group that [Mendoza-Garcia] fear[ed] harm from in Guatemala." Mendoza-Garcia responded that he did not fear "a group, per se" but that his town had been "divided in two groups" and one group "would come to the village to harm the village." Rather than following up to determine who comprised that group or how they harmed villagers like Mendoza-Garcia, the IJ asked for the population of the village.
Similarly, Mendoza-Garcia repeatedly stated that he was afraid to return to Guatemala but did not know what would happen to him if he returned. The IJ asked about this fear more than once but did not request examples of what Mendoza-Garcia feared or explain the need for specificity.
Whether this interaction amounts to an unconstitutional failure to develop the record is a close call. We need not resolve the issue, however, because this type of procedural due process claim requires a showing of prejudice.[1] See Graham v. Mukasey , 519 F.3d 546, 549-50 (6th Cir. 2008) ; see also Al Khouri , 362 F.3d at 466-67 ; Agyeman , 296 F.3d at 884. To prove prejudice, he must show that his "claims could have supported a different outcome." Sako v. Gonzales , 434 F.3d 857, 864 (6th Cir. 2006) ; see also Jashari v. Sessions , 722 F. App'x 481, 493 (6th Cir. 2018).[2]
Mendoza-Garcia argues that the absence of counsel is itself "the epitome of *509 prejudice," and that courts should not indulge in "nice calculations" as to the amount of prejudice incurred. But in the immigration context, we require a showing that these claims could have supported a different outcome. See Sako , 434 F.3d at 864. Because Mendoza-Garcia has not made that showing, his due process challenge necessarily fails.
III. CONCLUSION
For the foregoing reasons, the petition for review is DENIED .

Some circuits have held that certain procedural violations in which the Government failed to follow its own regulations do not require a showing of prejudice. See, e.g. , Leslie v. Attorney Gen. , 611 F.3d 171, 182 (3d Cir. 2010) ; Picca v. Mukasey , 512 F.3d 75, 78-79 (2d Cir. 2008). One commonly litigated example-at issue in both Leslie and Picca -is the failure to provide the list of pro bono attorneys, as required by 8 C.F.R. § 1240.10(a)(2). Mendoza-Garcia might have a claim under that regulation. He appears to have received a list of pro bono organizations at his very first hearing in April 2011. The list was not mentioned at any of his subsequent hearings, including when he told the IJ at his merits hearing six and a half years later that he was having "financial issues." It is at least arguable that failing to provide the list when he indicated he could not afford counsel and after so many years had passed was a regulatory violation. But Mendoza-Garcia did not raise this claim before the BIA or this court. We therefore do not consider whether prejudice would be required to succeed on such a challenge.

In some cases, we have used different language when describing the prejudice standard, requiring the petitioner to show that the procedural violation "led to a substantially different outcome." See, e.g. , Zheng v. Lynch , 819 F.3d 287, 297 (6th Cir. 2016) ; Gaye v. Lynch , 788 F.3d 519, 527 (6th Cir. 2015) ; Graham , 519 F.3d at 549-50. There may not be a meaningful difference between these two framings. For example, in the foundational case in the "substantially different outcome" line, we determined that the petitioner was barred from relief because he had been convicted of an aggravated felony. See Graham , 519 F.3d at 551. That result would have been the same under any framing of the prejudice standard. That said, if the two framings conflict, the earliest articulation-from our research, that in Sako -controls. See United States v. Mastromatteo , 538 F.3d 535, 545 (6th Cir. 2008). Sako 's permissive formulation is also more consistent with the prejudice standards used by other circuits, see Al Khouri , 362 F.3d at 466 (collecting permissive prejudice standards), and with our prejudice requirements in other contexts, see, e.g. , Girts v. Yanai , 501 F.3d 743, 757 (6th Cir. 2007) (Strickland prejudice is satisfied " if there is a reasonable probability that at least one juror would have struck a different balance" (citation omitted)); Apanovitch v. Houk , 466 F.3d 460, 475 (6th Cir. 2006) (Brady requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (citation omitted)).